Ed SCHUMACHER, et al., Plaintiffs,

v.

Edward C. ALDRIDGE, Jr., Secretary of the Air Force, Defendant.

Civ. A. No. 86–2015–LFO.

United States District Court, District of Columbia.

July 16, 1987.

Edward Silver, Larry M. Lavinsky, Joan Z. McAvey, Proskauer Rose Goetz & Mendelsohn, Washington, D.C., for plaintiffs.

Richard K. Willard, Asst. Atty. Gen., Joseph E. diGenova, U.S. Atty., Vincent Garvey, Mellie H. Nelson, Attys., U.S. Dept. of Justice, Civ. Div., Washington, D.C. (Steven J. Pecinovsky, Captain, USAF, Gen. Litigation Div., Office of The Judge Advocate Gen., of counsel), for defendant.

## MEMORANDUM AND ORDER

OBERDORFER, District Judge.

Plaintiffs are three persons who served as merchant seamen in World War II, and the American Federation of Labor, Congress of Industrial Organizations (AFL–CIO). Defendant is Edward C. Aldridge, who is sued in his capacity as Secretary of the Air Force. Title IV of P.L. 95–202, 91 Stat. 1449 (1977) (codified at 38 U.S.C. § 106 note) authorizes the Secretary to recognize the "active military service" of certain groups of individuals who engaged in activities related to World War II. Plaintiffs seek judicial review of the Secretary's decisions denying such recognition to (1) American merchant seamen who rendered service to the U.S. Armed Forces while in oceangoing service from December 7, 1941 to December 31, 1946 ("Oceangoing Group") and (2) American merchant seamen who participated in WW II military invasions ("Invasion Group"). Plaintiffs claim that the denials were arbitrary and capricious, an abuse of discretion, and contrary to law. 5 U.S.C. § 706(2)(A) & (B).

As relief, plaintiffs pray at a minimum for an order directing the Secretary to determine that the service of the Invasion Group was active military service for purposes of benefits under Title IV,[1] and for an order directing the Secretary to reconsider the application filed on behalf of the Oceangoing Group.

## I.

Section 401(a) of Title IV of the G.I. Bill Improvement Act of 1977, 38 U.S.C. § 106 note, provides that:

---

1. The parties suggest that the benefits afforded to someone who is deemed to have been in "active military service" under this section are mostly symbolic in value. Brigadier General Edward N. Giddings, USAF, Chairman of the DOD Civilian/Military Service Review Board, advised the Secretary of the Air Force, that with regard to the Invasion Group, "the benefits at stake here are really minimal.... [F]or the most part, [qualified merchant seamen] will only get a flag and a headstone." Record at 2122. (Citations to the Administrative Record shall hereinafter be designated by "AR–[page]".)

(1) Notwithstanding any other provision of law, the service of any person as a member of the Women's Air Forces Service Pilots (a group of Federal civilian employees attached to the United States Army Air Force during World War II), or the service of any person in any other similarly situated group the members of which rendered service to the Armed Forces of the United States in a capacity considered civilian employment or contractual service at the time such service was rendered, shall be considered active duty for the purposes of all laws administered by the Veterans' Administration if the Secretary of Defense, pursuant to regulations which the Secretary shall prescribe—

(A) after a full review of the historical records and all other available evidence pertaining to the service of any such group, determines, on the basis of judicial and other appropriate precedent, that the service of such group constituted active military service, and

(B) [the person is entitled to an honorable discharge].

(2) In making a determination under clause (A) ... the Secretary of Defense may take into consideration the extent to which—

(A) such group received military training and acquired a military capability or the service performed by such group was critical to the success of a military mission,

(B) the members of such group were subject to military justice, discipline, and control,

(C) the members of such group were permitted to resign,

(D) the members of such group were susceptible to assignment for duty in a combat zone, and

(E) the members of such group had reasonable expectations that their service would be considered to be active military service.

The original draft of section 401 was submitted to the Senate on October 19, 1977 by Senator Barry Goldwater as an amendment to the G.I. Bill Improvement Act of 1977, and made benefits available only to the Women's Air Forces Service Pilots (WASPs). 123 Cong.Rec. 34373–74 (1977). Members of this organization flew military aircraft during World War II within the continental United States and Canada. Senator Alan Cranston, chairman of the Senate Veterans Affairs Committee, opposed the amendment on the ground that other civilians, including members of the Merchant Marine, were also "subject to hazards and dangers while rendering valuable services in support of the Nation's defense." 123 Cong.Rec. 34376 (1977). Referring to the large number of "merchant marine personnel still living who served aboard ships under Navy regulations during World War II in hazardous areas," Senator Cranston cautioned against creating a precedent entitling persons classified as civilians to veterans' benefits. *Id.* at 34377. Instead of defeating the amendment, however, Senator Cranston's remarks led to its expansion. On November 3, 1977, Congressman Olin Teague, a member of the House Committee on Veterans' Affairs, proposed that the section be expanded beyond the WASPs to cover all groups "similarly situated." With this alteration, section 401 was enacted into law.

In 1979, as contemplated by 401(a)(1), the Secretary of Defense adopted regulations implementing that section. 44 Fed. Reg. 11,223 (1979), 32 C.F.R. Part 47 (1980). The current regulations, adopted in 1983, provide in part:

§ 47.4 *Policy*

(a) It is DoD policy to determine whether the civilian employment or contractual services of a civilian or contractual group shall be considered active military service for the purposes of laws administered by the Veterans Administration by considering judicial and other appropriate precedents, including the extent to which the members of such a group:

(1) Received military training and acquired a military capability, or the service performed by such group was critical to the success of a military mission.

(2) Were subject to military justice, discipline, and control.

(3) Were permitted to resign.

(4) Were susceptible to assignment for duty in a combat zone.

(5) Had reasonable expectations that their service would be considered to be active military service (see Pub.L. 95–202).

48 Fed.Reg. 38816 (1983), 32 C.F.R. Part 47 (1986).

The regulations further provide for the establishment of the Department of Defense Civilian/Military Service Review Board and Advisory Panel. That Board consists of a chairman, who votes only in the event of a tie, and a representative of the Secretary of Defense and of each of the Military Departments. The Board reviews each application and issues a written recommendation to the Secretary as to whether the service of the applicant group should be considered active military service for purposes of Title IV. Under section 47.6 of the regulations, the Board's review is limited to the written submissions filed by the applicant in support of its application, a written report prepared by the appropriate member or members of the Advisory Panel, and any other relevant information available to the Board and the criteria established by law. The Board then transmits its recommendation to the Secretary of the Air Force, to whom the responsibility for making a final decision has been delegated. The Board's recommendations and accompanying rationale have been adopted by the Secretary without fail.

Since 1977, 64 groups have applied for "active military service" status under section 401. Of these applicants, fourteen groups have been approved.[2]

The first group approved, not surprisingly, was the Women's Airforces Service Pilots (WASPs). Complaint, Exhibit A. That organization consisted of women pilots, responsible primarily for ferrying military aircraft within the continental United States and Canada. In support of its recommendation that this service be considered active military service, the Board concluded that the WASPs' functions "were essentially identical to any military pilot assigned to the Ferrying Division, Air Transport Command." *Id.* at 1. The Board also concluded that the WASP organization was integrated into a military command and control system, although it did not explain the features of that integration. Of all the factors, however, the Board placed greatest emphasis on the expectations of military officials, concluding that "[t]he military leaders of the day would appear to have had no doubt the WASP service was military...." *Id.* at 2.

Another successful applicant group was the Signal Corps Female Telephone Operators Unit. Complaint, Exhibit B. Women in this Unit operated telephone switchboards in 75 cities in France and England during World War I. In an opinion slightly

---

**2.** The successful applicants have been:

(1) Women's Airforces Service Pilots (WASPs) (WW II) (3/8/79);

(2) Signal Corps Female Telephone Operators Unit (WW I) (5/15/79);

(3) Engineer Field Clerks (WW I) (8/31/79);

(4) Women's Army Auxiliary Corps (WAAC) (WW II) (3/18/80);

(5) Civilian Employees, Pacific Naval Air Bases, who actively participated in the defense of Wake Island during WW II (1/22/81);

(6) Quartermaster Corps Female Clerical Employees Serving with the American Expeditionary Forces (WW I) (1/22/81);

(7) Reconstruction Aides and Dieticians in WW I (7/6/81);

(8) Male Civilian Ferry Pilots (WW II) (7/17/81);

(9) Wake Island Defenders from Guam (WW II) (4/7/82);

(10) Civilian Personnel Assigned to the Secret Intelligence Element of the OSS (WW II) (12/27/82);

(11) Guam Combat Patrol (WW II) (5/10/83);

(12) Quartermaster Corps Keswick Crew on Corregidor (WW II) (2/7/84);

(13) U.S. Civilian Volunteers who Actively Participated in the Defense of Bataan (WW II) (2/7/84); and

(14) U.S. Merchant Seamen who Served on Blockships in Support of Operation Mulberry in the Normandy Invasion (WW II) (10/18/85).

The decisions setting forth the facts and rationale for the Board's favorable recommendations of these groups are, on average, one to two pages long, single-spaced. *See* Complaint, Exhibits A–N.

more than one page long, the Board recommended that their service be deemed active military service. In full, the Board reasoned:

> The female telephone operators were recruited for their unique skills which were deemed necessary to improve the operating efficiency of the military telephone system of the [American Expeditionary Forces].

> With the exception of those in training or en route at the time the group was deactivated, they served overseas with the Army. Availability of the female operators theoretically released soldiers for combat or telephone operators for service at more dangerous locations.

> Female telephone operators were hired as civilian employees of the Signal Corps. Since no legal means existed at the time to enlist or commission women into the Army, it was the only means to acquire their services. The Board concludes that without the statutory restrictions prohibiting women in the Army, the Female Signal Corps Telephone Operators Unit could have been and probably would have been regularly enlisted into the Army.

*Id.* at 1–2.

The Secretary also approved the application filed on behalf of the World War I Quartermaster Corps Female Clerical Employees Serving With the American Expeditionary Forces. Complaint, Exhibit F. These women were contract employees hired for clerical positions "because of a continuing shortage of qualified stenographers/typists" during World War I. *Id.* at 1. The Board recommended that their service be considered active military service, explaining that:

> Those who volunteered to serve with the AEF did not know in advance where, overseas, they would be assigned. Although none was assigned to duties in a combat zone, nothing barred such an assignment, and they did all serve in a war theater. They ... contribute[d] to the success of the military mission [by relieving enlisted men for duty at the front]. The AEF female clerical employees wore

uniforms and, because they were serving in a war theater, were subject to military laws and regulations.... Although in theory these women could resign prior to the. expiration of the terms of their contracts, a heavy [financial] penalty would have been imposed for such breaches.... Finally, there is evidence that these women considered that their service would be recognized as active military service.... [H]ad there not been statutory restrictions prohibiting women in the Army, the female clerical employees serving with the AEF probably would have been enlisted into the Army.

*Id.* at 2.

## II.

To understand the focus of the present dispute, it is helpful to review the history of the Merchant Marine in World War II, as established by the record in this case.

Before the start of the war, merchant ships were privately owned and controlled by shipping companies for the transport of commercial cargo. Seamen signed shipping articles, normally for a period of not more than twelve months, setting forth with particularity the destination and nature of the voyage. The requirement of particularity in shipping articles was designed "to protect seamen ... and to assure against harsh application of the iron law of the sea." *NLRB v. Waterman S.S. Corp.*, 309 U.S. 206, 212, 60 S.Ct. 493, 497, 84 L.Ed. 704 (1940); *see generally, The Quoque*, 261 F. 414, 415 (E.D.Va.1919) ("The manifest intent and purpose of the statute was to protect seamen, and advise them, as far as possible, of the general nature and description of the voyage, in advance of starting upon the same, of the foreign port they were to go to, together with the length of time of the service, and when the same would terminate."), *affd. sub nom. United States v. Westwood*, 266 F. 696 (4th Cir.1920). Accordingly, courts construed shipping articles narrowly, *see, e.g., The Thomas Tracy*, 24 F.2d 372, 374 (2d Cir.1928), and often voided the articles for lack of particularity. *See, e.g., United States v. Westwood*, 266 F. 696, 697 (4th

Cir.1920); *The Occidental,* 101 F. 997, 998 (D.Wash.1900).

With the advent of World War II, the peacetime requirements and procedures changed. More than a year before the attack on Pearl Harbor, the Coast Guard began training merchant seamen in gunnery and other military subjects. The Naval Reserve also trained merchant seamen in military subjects. By September 1941, gunnery training of merchant crews had been authorized on 83 Panamanian flag vessels.

In October 1941, President Roosevelt asked Congress to lift the ban on arming merchant ships which had theretofore been in effect. President Roosevelt explained that it was not just to deny merchant seamen the means of defending their lives and their ships while they were "sailing the seas on missions connected with the defense of the United States." AR–16. One month later, in November 1941, Congress complied with the President's request and authorized merchant ships to be armed. AR–16. Thereafter, merchant seamen received additional military training in gunnery, handling barrage balloons, wartime communications, gas warfare, swimming through burning oil, and enemy ship spotting at night. AR–17–20, 84–86, 102–05, 110–70, 813–14, 1242, 1266–84, 1294–95; Statement of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment at 27 (hereinafter "Plaintiffs' Motion").

The normal peacetime requirements for specificity in shipping articles also changed. By order of the Secretary of the Navy, the statutory provision requiring shipping articles to contain particulars as to the nature of the intended voyage and engagement was waived. 7 Fed.Reg. 2477 (1942); AR–312–13; *see also* AR–327 (WSA Security Order stating that "Articles should be drawn so as *not* to disclose the nature, duration, or area of the intended voyage.") (Emphasis added.) These measures were taken to preserve wartime secrecy. *Farrell v. United States,* 336 U.S. 511, 520, 69 S.Ct. 707, 711, 93 L.Ed. 850 (1949); *see also Cosmopolitan Shipping*

*Co. v. McAllister,* 337 U.S. 783, 799, 69 S.Ct. 1317, 1325, 93 L.Ed. 1692 (1949). Consequently, shipping articles, which in the past had been held to high levels of particularity, were to take the following form:

> To a point in the [e.g., Atlantic] Ocean to the [east] of [Philadelphia] and thence to such ports and places in any part of the world as the Master may direct or as may be ordered or directed by the United States Government or any Department, Commission or agency, thereof, and back to a final port of discharge ... in the United States ... for a term of time not exceeding — calendar months.

AR–312–13.

More dramatic changes in the operation of the merchant fleet were effected by Executive Order 9054, AR–1139–41, by which President Roosevelt created the War Shipping Administration (WSA), a civilian federal agency established within the Executive Office of the President. By that order, all of the functions, duties and powers conferred upon the United States Maritime Commission with respect to the operation and requisition of vessels were transferred to the WSA, as well as any personnel and records which the WSA deemed necessary for its functions. The vessels thereby assigned to the WSA constituted "a pool to be allocated by the Administrator" for use by the United States military and other Federal departments and agencies, consistent with "strategic military requirements." Order 9054(4); AR–1140. The Administrator of the WSA was further instructed to "maintain close liaison with the Departments of War and the Navy" and to "collaborate with existing military [and] naval departments ... to secure the most effective utilization of shipping in the prosecution of the war" and to ensure the proper and timely movement of military personnel and supplies. Order 9054(6); AR–1140. The agency was headed by retired Navy Admiral Emory S. Land.

Through the creation and operation of WSA, most merchant seamen became employees of the United States, and seventy-five percent of merchant shipping was allo-

cated to Army and Navy cargoes. AR–26. In addition to equipment and ammunition, merchant ships transported military and civilian personnel to war zones, including the great majority of the more than 7 million Army personnel transported overseas. AR–26–27. The Merchant Marine's participation in supplying the military needs of the United States prompted Admiral King to remark:

During the past 3½ years, the Navy has been dependent on the Merchant Marine to supply our far-flung fleet and bases. Without this support, the Navy could not have accomplished its mission. Consequently it is fitting that the Merchant Marine share in our success as it shared in our trials.

AR–27.

Admiral Chester Nimitz further remarked: "This war has fully confirmed the necessity for a strong ... merchant marine ... so that it may be employed *as an auxiliary of the Army and Navy* in time of war." AR–241 (emphasis added); *see also Northern Pacific Ry. Co. v. United States,* 330 U.S. 248, 253–54, 67 S.Ct. 747, 750, 91 L.Ed. 876 (1947).

Beyond the arming of merchant ships, the training of merchant seamen, the allocation of cargo to the military, and the changes in the terms of employment, the record discloses numerous ways by which the military exercised direct control over the operations of the Merchant Marine. Military authorities controlled the duration, route and destination of merchant voyages. *See, e.g.,* AR–303–05, 312–13, 326–27. Military authorities also controlled the ship's position in a military convoy, when the ship was to be darkened and when it would maintain radio contact, procedures for dealing with a "straggler," terms of shore leave in a war theatre, when to engage the enemy, and discipline for offenses involving misconduct and incompetence. AR–34, 274, 278–85, 305, 307–08, 310–11, 351, 1524, 1535. Wartime military control superseded the authority of the master when the military decided this was necessary. AR–288, 303–06, 1192. Moreover, the Master's ability to decide the fate of his ship and crew

was superseded by Order of the Secretary of the Navy, which required the Master not to surrender his ship. AR–309.

A seaman who attempted to resign during a voyage or otherwise violated military policy faced military court martial. AR–36–38; *see also McCune v. Kilpatrick,* 53 F.Supp. 80 (E.D.Va.1943). A 1943 study disclosed that over a period of several months, there were 111 cases of courts martial brought against merchant seamen, resulting in 101 convictions. AR–29. A 1943 Navy memorandum confirmed that "[b]oth the Army and the Navy ... have asserted the jurisdiction of the military [over merchant seamen] ... in the widest possible latitude." AR–260, 1524.

Because of their importance to the military, merchant seamen were exempted by Congress from induction into the armed forces for the duration of their service in the Merchant Marine. The importance of the Merchant Marine to the military, however, was demonstrated most forcefully by the government's efforts to attract men to serve in that organization.

Military officials instructed draft boards to inquire whether any registrant with sailing experience was willing to accept employment in "active oceangoing service" and "if he agrees" to refer him to the Merchant Marine. The Army, in fact, released experienced seamen for service in the Merchant Marine. And for its part, the War Shipping Administration actively sought to prevent any Merchant Marine officer whose removal would "interfere with vessel operation or result in ship delays" from being called to active Naval duty.

General Lewis B. Hershey, then Director of the Selective Service System, wrote to local draft boards:

Service in the merchant marine, considering its important to the war effort and the hazards involved, is so closely allied to the service in the armed forces that men found by the local board to be actively engaged at sea may well be considered as engaged in active defense of the country. *Such service may proper-*

*ly be considered as tantamount to military service.*

AR–70 (emphasis added).

Answering the Nation's call to duty, many seamen signed on for additional voyages at the expiration of their terms. During the war, the turnover rate in the Merchant Marine was one-fourth the pre-war rate.

In a speech in May 1942, President Roosevelt proclaimed: "The war is now five months old and we have had our answer. Two million men have been called to the colors. In far places and near, our soldiers, our sailors, our air pilots, the beleaguered men of the Merchant Marine, have shown the stuff of heroes. Everything we have asked of them they have delivered. Everything—and more." AR–68. One year later, President Roosevelt remarked:

> The men of our American Merchant Marine have pushed through despite the perils of the submarine, the dive bomber and the surface raider. They have returned voluntarily to their jobs at sea again and again, because they realized that the life-lines to our battle fronts would be broken if they did not carry out their vital part in this global war.

AR–239.

The President also declared that for purposes of military decorations, the officers and crew members of the Merchant Marine would be regarded "as members of the armed forces." AR–70, 483–84. In November 1946, the Navy took similar action, announcing that officers in the Merchant Marine who held Naval Reserve commissions but who were not on active Naval duty during the war, would receive credit for their service in the Merchant Marine for purposes of promotion in the Naval Reserve. The Navy explained that "[t]he majority of these officers performed war service in the Merchant Marine which was comparable to active duty with the Navy." AR–15–16. Families of merchant seamen

were authorized by Congress to display a "service" flag, an honor previously reserved to members of the armed forces. AR–71.

And General Douglas MacArthur said of the merchant seamen who participated in the invasion of the Phillipines:

> On these islands I have ordered them off their ships and into fox holes when their ships became untenable targets of attack.
>
> At our side they have suffered in bloodshed and death. The high caliber of efficiency and the courage they displayed in ... the invasion of the Phillipines marked their conduct throughout the entire campaign in the Southwest Pacific. They have contributed tremendously to our success. I hold no branch in higher esteem than the merchant marine service.

AR–241–42, 1516–17.

The service of the Merchant Marine to the war effort was not without cost. Merchant seamen suffered heavy casualties. During the first year of the war, 3.8% of merchant seamen were killed by enemy action. The death rate for members of the regular armed services during this same period was 1%. AR–41. From mid-January to mid-March 1942 alone, German U-boats sank 145 merchant ships in American coastal waters, killing 600 merchant seamen. In May 1942, another 41 merchant ships were sunk by U-boats in the Gulf of Mexico. AR–12. For the entire war period, 2.8% of merchant seamen who registered with the U.S. Maritime Service were killed. This percentage was higher than the casualty rate for the Army or the Navy, and was second only to the U.S. Marine Corps, which had a death rate of 2.9%. AR–41. In all, 5662 merchant seamen lost their lives or were declared missing in action in World War II.[3] AR–13, 41. Another 609 merchant seamen became prisoners of war and thousands more were wounded. AR–13. As of V-J day, 733

---

**3.** In the event that a merchant seaman was lost at sea, his family received a telegram from the United States Navy, stating: "The Navy Department deeply regrets to inform you that your ...

[relationship and name] is missing and presumed lost following action in the performance of his duty and in the service of this country." AR–71–72.

American merchant marine vessels of over 1,000 gross tons were sunk. AR–40.

Against this historical backdrop, it is not surprising that merchant seamen were often mentioned as likely beneficiaries in the legislative history of section 401. Dorothy Starbuck, Chief Benefits Director of the Veterans' Administration, testified that while the WASPs served as de facto military personnel, they were not unique in this respect: "[W]e had a number of groups who served as civilians. Probably, the most significant or largest group would be the merchant marines, and these individuals who served would be in somewhat the same position as the Women's Air Force Service Pilots." Recognition for Purposes of VA Benefits, 1977: Hearing on S. 247 Before the Senate Comm. on Veterans' Affairs, 95th Cong. 1st Sess. 56 (1977).

### III.

#### A.

In January 1980, the AFL–CIO submitted an application on behalf of Oceangoing Merchant Marines. The term "active oceangoing service," as defined by plaintiffs, covered only service on oceangoing vessels under the flag or control of the United States which operated on coastal and foreign routes. "It does not cover service that was limited to the inter-coastal waterways and/or the inland waterways, including harbors, rivers, canals, bays, sounds, the Great Lakes or other lakes." AR–10. The application, which General Caudry acknowledged to be "by far the most complete, well-documented application [the Board has] received," AR–2038, described both an overall group and seven subgroups. The seven subgroups consisted of merchant seamen who, while rendering service to the Armed Forces of the United States:

(1) served on Navy gun crews;

(2) served on ships that engaged the enemy . . .;

(3) were physically wounded (some disabled) as a result of enemy action;

(4) became prisoners of war;

(5) lost their ships because of enemy action but survived . . .;

(6) experienced battle reaction or convoy fatigue which resulted in their temporary assignment to convalescent centers operated under WSA; or

(7) served in combat or war zones under constant threat of annihilation by enemy air or submarine attack.

AR–5.

In a letter dated July 28, 1981 to Verne Orr, Secretary of the Air Force, Lane Kirkland, AFL–CIO President, wrote that "[i]n light of the complexities of this application and the length of time it has been pending, we want to express to you our hope and expectation that the ruling, when it comes, will deal with both the oceangoing Merchant Marine group as a whole and subgroups of this class, as well." AR–1.

On January 5, 1982, the Board recommended to the Secretary that he disapprove the application. Complaint, Exhibit Q. In the cover memorandum accompanying the Board's negative recommendation, Joseph Lineberger, Deputy for Air Force Review Boards, advised the Secretary that there is "some lingering sensitivity about this subject among WW II veterans," and that "the Department of the Navy is strongly opposed to granting [the Oceangoing] request." AR–1980.[4]

Subsequently, on January 13, 1982, the Secretary adopted the Board's recommendation and denied the application of the

---

**4.** Plaintiffs suggest that this opposition resulted from the misconception that merchant seamen were paid substantially more for their service than enlisted men. In support, they cite General Caudry's remark to a newspaper that "it wasn't only the public perception that [merchant seamen] were draft dodgers. Some veterans groups felt military men sacrificed home and money to fight the war and the merchant seamen did not make those kinds of sacrifices."

AR–1970. In fact, studies report that the total remuneration of merchant seamen was about the same as that received by Army and Navy men. AR–78 n. 60, 1182. Similarly, a 1979 report prepared by Dr. Dean C. Allard of the U.S. Naval Historical Center indicated that, according to the WSA, the "total remuneration of equivalent military and Merchant Marine personnel was approximately comparable." AR–1181–82.

Oceangoing group. The decision, which was two and one half pages long, single-spaced, did not consider the eligibility of any of the proposed subgroups. The decision acknowledged that "[t]he service performed by the WW II Merchant Marine was critical to the success of the American war effort and often took place within a combat zone." Complaint, Exhibit Q at 1. The decision further acknowledged that "[t]he risks faced by merchant seamen were as great as those faced by America's military forces." *Id.* However, explaining the basis for disapproval of the overall group, the Secretary concluded that the seamen:

a. received limited military training, which was defensive in nature, and constituted only a small percentage of their total instruction;

b. did not render service exclusively to the United States Armed Forces;

c. were not subject exclusively to military jurisdiction—most of the discipline was exercised by the ship's master;

d. were not subject to "pervasive" military control, since much of the military's control over merchant ships—e.g., routing instructions—applied primarily to the ship's master "and only peripherally to individual merchant seamen;"

e. had no reasonable expectation of "active military service" status; and

f. were not part of a wartime organization, formed for or because of a wartime need;

*Id.* at 2–3. The decision also noted that, although merchant seamen were not permitted to resign for the duration of their voyage, "this was not a war-unique rule. Even in peacetime, merchant seamen may not resign during a voyage." *Id.* at 2.

### B.

A later application on behalf of a so-called Invasion Group was filed in February 1983. This application embraced all American merchant seamen who participated in a military invasion during World War II, including the invasions of Normandy, Sicily and the Phillipines. AR–1306–08. On May 13, 1985, by a vote of 3 to 1, the Board recommended that the application be denied, generally for the reasons cited above with respect to the Oceangoing Group. Complaint, Exhibit S. The Board stated that the Invasion group seamen were no different from merchant seamen generally with regard to the extent and nature of their military training, and the extent and nature of the military discipline and control exercised over them. On the issue of the group's susceptibility for assignment to duty in a combat zone, the Board found that the voluntary nature of their exposure to combat argued against the seamen's application. The decision explained that, because "the shipping articles used both before and during the war were essentially the same," a merchant seaman signing onto a voyage "had a reasonably good idea of where that voyage would be heading and generally what that voyage would entail. The merchant seaman, then, like journalists, Red Cross workers, etc., ... entered his contract with some idea of the risks that might be involved." *Id.* at 3, 4. Therefore, the Board said, assignment to a combat zone "does not warrant recognition of services rendered in such combat areas as active military service." *Id.* at 4. The decision did note, however, that the service of the Invasion group seamen was rendered exclusively to the Armed Forces and was essential to the success of the military mission.

On the same day, the Board issued its recommendation on an application submitted on behalf of "Merchant Seamen Requisitioned by [the] U.S. Army for Participation in Operation Mulberry." Complaint, Exhibit N. Operation Mulberry involved the construction of artificial harbors ("mulberries") to facilitate the World War II invasion of Normandy. These artificial harbors were constructed out of steel and concrete structures supported by sunken blockships, to provide a breakwater for vessels landing on the invasion beaches. The Board's decision reported that approximately one thousand merchant seamen were required to sail the blockships into position, with thirty to forty merchant seamen on each ship. Some of these seamen volunteered (although they were not told the

nature of the mission) while others were "commandeered" into service. In the weeks before the mission, they were confined aboard their ships primarily for security reasons. At least some seamen had their personal belongings and papers taken from them and were issued military clothing and identification cards in their place. Once a blockship was in position, the seamen were taken off the ships and sent back to England, while military gun crews and demolition teams remained on board to set off the explosive charges. During the blockship operation, ten merchant seamen were injured. None was killed.

After reviewing this history, the Board recommended approval of the Operation Mulberry/Blockship application but recommended disapproval of the application submitted on behalf of the overall Operation Mulberry group, explaining that the overall group "was too broad and diverse to make an adequate determination as to the roles played by the multitude of subgroups and members that made up Operation Mulberry." *Id.* at 2. However, with regard to the seamen who participated in the blockship operations, the Board stated:

> These merchant marines performed a uniquely military mission in a combat zone that would not normally be considered a mission of the Merchant Marine. The merchant crews were not tasked with delivering a cargo, per se, but were asked to be a part of a team to create an artificial harbor—a beachhead mission normally associated with military engineers for a military operation. This is not a mission that the Merchant Marine historically perform. This group, then, was a creation of World War II for that specific time and place, i.e., the Invasion of Normandy.

*Id.* at 3.

The Board's chairman, Brigadier General Edward N. Giddings, USAF, did not vote on the Invasion Group application. As the chairman, he was empowered to vote only in the event of a tie. Nevertheless, he argued that the decisions approving the Blockship application and denying the Invasion application were inconsistent, and, in a memorandum to the Secretary dated May 13, 1985, General Giddings wrote:

> As the Chairman of the Board and based upon my own personal study of each application, I do not agree with the recommendations and rationale of the Board which differentiates between the Invasions Group and Operation Mulberry.... The distinctions between the Board's rationale for its recommendations on the Invasions Group and Operation Mulberry are not only difficult to support, but are fuzzy. These "invasions" were indeed uniquely military, and it is difficult to imagine an invasion effort in World War II that was not *under total military control*.... I feel that the Board is maintaining a "fine-line" distinction between the Invasions Group and Blockships. This distinction might not only prove difficult to litigate in court, should we be challenged on this determination, but more importantly, it is a distinction that will be difficult to rationalize in the public forum.

AR–2121–22 (emphasis in original).

Over General Giddings' dissent, the Secretary approved and adopted the Board's recommendation and rationale, and rejected the Invasion Group application.

## IV.

On July 23, 1986, plaintiffs filed this suit, challenging the denial of the Invasion Group and the Oceangoing Group applications. Plaintiffs argue that the merchant seamen included in those applications satisfy the established criteria to a greater extent than many of the approved groups. Accordingly, they argue that the denials are inconsistent with the Secretary's prior decisions.

In response, the Secretary states that plaintiffs have misunderstood the governing criteria, and that examination of the fourteen favorable decisions discloses common characteristics which explain those decisions and which plaintiffs here do not share. Defendant explains:

> Examination of the decisions shows that the Secretary and the Board have uniformly and consistently interpreted

Title IV as requiring a group seeking active military service credit to demonstrate [1] that its service was well integrated into the military structure to the extent that the group virtually lived and worked under the same conditions as the military, [2] that extensive, if not pervasive, military control was exercised over the members of the group, [3] that the group was a wartime organization, formed for or because of a wartime need, [4] that the members of the group were generally prevented by law, treaty, or exigencies from being in the military at the time of their service, and [5] that expectations of active military service, not merely of benefits, justified a designation of their service as active military service.

Memorandum of Points and Authorities in Support of Motion for Defendant for Summary Judgment at 17–18 (hereinafter "Defendant's Motion").

### V.

■ Before moving to the merits of the controversy, it is necessary to address some preliminary matters. Defendant argues, without enthusiasm, that the Secretary's decisions in this case are nonreviewable under the Administrative Procedure Act because they constitute action committed to agency discretion by law. 5 U.S.C. § 701(a)(2). *See* Defendant's Motion at 11 n. 7; Defendant's Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment and in Further Support of Motion of Defendant for Summary Judgment at 4–5, n. 4 (hereinafter "Defendant's Opposition"). The cases relied upon by defendant, however, are distinguishable. Both cases involved judicial review of an agency's discretionary exercise of its enforcement authority. *See Heckler v. Chaney,* 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985); *Falkowski v. EEOC,* 764 F.2d 907 (D.C.Cir.1985), *cert. denied,* — U.S. ——, 106 S.Ct. 3319, 92 L.Ed.2d 727 (1986). These cases emphasize that section 701(a)(2)'s exception to judicial review is very narrow and does not apply here. The Secretary's decisions are reviewable.

■ Defendant further argues that, if reviewable, the Secretary's decisions are entitled to heightened deference "where, as here, military matters are the subject of dispute." Defendant's Motion at 12. This argument for heightened deference is unpersuasive. While the military needs to function without judicial interference in matters which might arguably affect national security, *see, e.g., Aero Corp. v. Department of Navy,* 549 F.Supp. 39 (D.D.C. 1982), such concerns are not implicated here. The issues in this case do not touch upon matters of national security or military preparedness, but go merely to the administration of public benefits. Under this circumstance, no special deference is appropriate. *See Frontiero v. Richardson,* 411 U.S. 677, 690–91, 93 S.Ct. 1764, 1772, 36 L.Ed.2d 583 (1973); *Goldman v. Secretary of Defense,* 734 F.2d 1531, 1537 (D.C.Cir.1984), *affd.,* 475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986); *Hoskin v. Resor,* 324 F.Supp. 271 (D.D.C.1971).

■ Nevertheless, traditional principles of administrative law suggest that deference be given to a department's interpretation of a statutory scheme that it administers. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984). This deference is consistent with Congress' clear desire to afford the Secretary flexibility in the administration of section 401.

According deference to the Secretary's determinations is complicated, however, by the Secretary's failure to articulate clear and intelligible criteria for the administration of section 401. As stated above, Congress suggested five factors that the Secretary may take into consideration in determining whether the service of any group should be considered "active military service" for purposes of Title IV. Those factors are poorly defined. In fact, the Secretary argues that the indeterminacy of the five "vague and undefined" criteria confirms Congress' intent to vest broad discretion in the Secretary. *See* Defendant's Opposition at 4 (stating that the crite-

ria offer "no guidance on how to determine what service should be considered active military service," and are "silent as to how the Secretary is to apply, consider or weigh the factors").

The vagueness of the five criteria proposed by Congress, however, did not extend to Congress' command that the Secretary adopt regulations implementing section 401. Congress might reasonably have hoped that those regulations, which have the force and effect of law, *see Chrysler Corp. v. Brown*, 441 U.S. 281, 295, 99 S.Ct. 1705, 1714, 60 L.Ed.2d 208 (1979), would elaborate and better define the considerations relevant to a determination of "active military service." Rather than articulating specific, meaningful criteria to guide decisions under section 401, however, the Secretary adopted Congress' criteria, without change or supplementation, as his own.

Consequently, "military training" is nowhere defined. It is therefore impossible to determine whether military training is limited to such things as training in discipline, gunnery and military movements or whether it also includes training in such skills as radio-communications, medicine, and engineering. More important for present purposes, it is unclear whether the term military training as used by the Secretary includes instruction in the navigation and engineering skills practiced by officers and servicemen in the Navy.[5]

The reasonable expectation criterion is even more elusive. The Secretary explains that merchant seamen did not "have reasonable expectations that their service would be considered active military service, but merely that they would receive benefits similar to military benefits." Defendant's Motion at 8. The regulations, however, do not indicate how the existence of a "reasonable expectation" in 1945 is to be determined today. There is no evidence that "active military service" had a common meaning in 1945. It appears instead that

Congress created the term, inserted it into the statute, and instructed the Secretary to define it, on the basis of five vague criteria, one of which makes the meaning of "active military service" depend on what people would have thought it meant 30 years ago.

### VI.

In addition to vague criteria, it appears that the Secretary applied criteria which were not published in the statute or in the implementing regulations. Explaining the decisions denying plaintiffs' applications, the Secretary states that the fourteen successful groups shared characteristics which the plaintiffs did not. The approved groups, for instance, were all "wartime organization[s], formed for or because of a wartime need," while the Merchant Marine pre-dated the war. Defendant's Motion at 17. Furthermore, defendant explains, members of the successful groups were generally prevented by law, treaty, or exigencies from joining the military, while no such prohibition applied to merchant seamen. *Id.* at 17–18.

Neither of these criteria is stated in section 401 or in the implementing regulations. Although Congress gave the Secretary discretion in adopting appropriate regulations, it assuredly did not license the Secretary to publish one set of criteria and to apply another.

■ An agency must let its standards be known. "No matter how rational or consistent with congressional intent a particular decision might be, the determination of eligibility cannot be made on [ad hoc or unstated criteria]." *Morton v. Ruiz*, 415 U.S. 199, 232, 94 S.Ct. 1055, 1073, 39 L.Ed.2d 270 (1974); *see also Northern Colorado Water Conservancy Dist. v. FERC*, 730 F.2d 1509, 1521 (D.C.Cir.1984) (an agency " 'must, at a minimum, let the standard be generally known so as to avoid both the reality and appearance of arbi-

---

**5.** The Secretary has approved active military service status for Engineer Field Clerks. According to plaintiffs, *see* Memorandum in Opposition to Defendant's Motion for Summary Judgment at 27–28 (hereinafter "Plaintiffs' Opposition"), the "military training" of these people consisted of calisthenics and hikes to keep them in good physical condition. Similarly, the "military training" of the Quartermaster Corps Female Clerical Employees Who Served With the AEF consisted of instruction in "War Department paper work and administration."

trariness.' Those relying on the procedures set out in a statute have a right to know that those procedures are being given less than their clear meaning.") (quoting *Morton v. Ruiz*, 415 U.S. at 231, 94 S.Ct. at 1072); *National Black Media Coalition v. FCC*, 791 F.2d 1016, 1023–24 (2d Cir.1986).

■ The fact that the Secretary has discretion in promulgating regulations does not relieve him of his duty to adhere to the regulations, once adopted. As our Court of Appeals recently stated, "[e]ven if the action of the agency is discretionary by statute, the agency's own regulations must be complied with by the agency after they are issued." *California Human Development Corp. v. Brock*, 762 F.2d 1044, 1049 (D.C. Cir.1985), citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971); *see also Service v. Dulles*, 354 U.S. 363, 388, 77 S.Ct. 1152, 1165, 1 L.Ed.2d 1403 (1957); *Massachusetts Fair Share v. Law Enforcement Assistance Admin.*, 758 F.2d 708, 711 (D.C.Cir.1985). By making decisions based on unpublished criteria, the Secretary frustrated the purpose of the implementing regulations and denied plaintiffs a fair opportunity to present their case.

### VII.

In addition to the foregoing, the Secretary has failed to apply established standards for administrative decisionmaking. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2877–67, 77 L.Ed.2d 443 (1983). This failure renders it difficult to evaluate the Secretary's decisions and to determine whether the regulations' criteria have been applied even-handedly. The Secretary's decision approving the application of the World War I Signal Corps Female Telephone Operators Unit illustrates this point. That decision makes no reference to most of the criteria set out in the regulations. The decision nowhere discusses the nature or extent of the applicants' military train-

ing or capability, or the degree to which they were subject to military discipline and control. The decision does not address whether members of that Unit were permitted to resign, or whether they possessed a reasonable expectation that their service would, sixty years later, be deemed active military service. The only criterion arguably applied was the importance of the operators' service to the success of the military mission, although evidence of this consideration requires a generous reading of both the decision and the scope of the criterion.

Similarly, the decisions approving other applications frequently omit reference to many of the governing criteria. Plaintiffs report, and defendant does not refute, that:

the military training criterion was not discussed in the Rationale Memoranda explaining decisions to grant active military service status to six groups. The military capability criterion was not discussed in the Rationale Memoranda on six successful groups. The Rationale Memoranda on nine successful groups did not discuss whether the service of those groups was critical to the success of a military mission. The extent to which the group was subject to military justice was not discussed in the Rationale Memoranda on eleven successful groups. Military discipline was not discussed in Rationale Memoranda on ten successful groups, nor was military control discussed in Rationale Memoranda on six successful groups. Likewise, the resignation criterion was not discussed in Rationale Memoranda on five successful groups. The assignment to combat zone criterion was not discussed in Rationale Memoranda on three successful groups. Finally, there was no discussion of the reasonable expectations criterion in Rationale Memoranda on eleven successful groups.

Plaintiffs' Motion at 9–10.[6]

Because the criteria are vague and have not been applied in a workmanlike manner,

---

**6.** The Secretary states in response that "simply because a decisional memorand[um] does not discuss one of the statutory guidelines does not mean that it was not considered." Defendant's Opposition at 13.

it is difficult to assess the accuracy and significance of many of the Board's conclusions.

For instance, plaintiffs were faulted because the Merchant Marine was not a "wartime organization, formed for or because of a wartime need." As previously noted, this criterion is not found in the statute or in the implementing regulations. In addition, defendant concedes that many of the approved groups were not truly "organizations" at all, but were designated such only because section 401, by its terms, speaks of qualifying "groups."

A second reason given for denying plaintiffs' applications was that, "[u]pon completion of a voyage, [merchant] seaman could decline to volunteer for another voyage." Complaint, Exhibit Q at 1; *see also* Complaint, Exhibit S at 3. Whether merchant seamen had a right to resign or merely a right not to renew their service, it is clear that members of many successful groups could resign as well.[7]

Defendant also faults merchant seamen because their military training was limited and defensive in nature. Without a definition of "military training," it is difficult to assess this finding. However, the record contains unrefuted evidence that merchant seamen were trained in weaponry and wartime navigation techniques. The record is silent, on the other hand, as to the military training of dieticians, telephone operators, and other successful applicants. Furthermore, the Board's distinction between offensive and defensive military training finds no support in section 401 or the implementing regulations.

The Secretary deemphasizes the extent to which merchant seamen were subject to military discipline by noting that most of their discipline was meted out by the ship's master and not by military officials. The Board's decision, however, does not evidence sufficient consideration of the degree to which military control and jurisdiction were *actually* exercised over merchant seamen. As indicated above, merchant seamen were often subject to military discipline, as evidenced by the more than 100 merchant seamen court-martialed before the end of 1943. By contrast, the record discloses no instance of a WASP being tried by a court martial. AR–1183.

Another reason for denying the applications, the Secretary explains, was the fact that "pervasive" military control was not exercised over merchant seamen. However, in explaining why other groups were approved, the Secretary states that "extensive, if not pervasive, military control was exercised over the members of the group." Defendant's Motion at 17. The Secretary does not address whether military control over merchant seamen was "extensive."

## VIII.

■ Review of the voluminous record in this case compels the conclusion that the criteria set forth in the Secretary's regulations have not been applied even-handedly. Admittedly, demonstrating that the criteria have not been applied even-handedly is complicated by the vagueness of those criteria. Nevertheless, the record indicates that at least one of plaintiffs' applications satisfied the relevant, published criteria to an equal or greater extent than some successful groups.

With regard to the Invasion Group application, the Board recognized that the service of those merchant seamen was rendered exclusively to the military and was critical to the success of the military mission. Those seamen also possessed a military capability. The Navy historian's report to the Board stated:

> Merchant ships participating in military invasions had a military capability resulting from their logistical support of the

---

7. Members of the Guam Combat Patrol were free to resign, as were Reconstruction Aides and Dieticians, Signal Corp Telephone Operators and Male Civilian Ferry Pilots. Quartermaster Corps Female Clericals Who Served With the AEF could resign as well, subject to a financial penalty. Plaintiffs' Opposition at 26 n. 45.

"Members of these successful groups who *resigned* are now eligible for active military service status under Title IV, as are the more than 14,000 WAACS who *resigned* in the *middle of the war* rather than accept military status!" *Id.* at 26–27 (emphasis in original).

**56**

armed forces.... The group's application and the [historian's previous] report entitled "Ocean-Going Merchant Marine" show that merchant marine personnel often assisted and augmented the Naval Armed Guard....

Ships of the Merchant Marine participating in military invasions demonstrated that they had a military capability.

AR–1827, 1295.

Merchant seamen participating in invasions were not only susceptible to assignment in a combat zone, but were actually assigned there. The seamen could not resign during their term of service. And with regard to military control, the record supports Board Chairman Brigadier General Giddings remark that "it is difficult to imagine an invasion effort in WW II that was not under total military control." AR–2121.

Review of the record and the Secretary's previous decisions (particularly the decisions approving the Blockship and Keswick Crew applications) establish that defendant erred in denying the Invasion Group application. Conceding the Secretary's experience in making determinations under section 401, "[d]eference to agency authority or expertise ... 'is not a license to ... treat like cases differently.'" *Airmark Corp. v. FAA*, 758 F.2d 685, 691 (D.C.Cir. 1985) (quoting *United States v. Diapulse Corp.*, 748 F.2d 56, 62 (2d Cir.1984)); *see also Department of Treasury v. FLRA*, 707 F.2d 574, 581 n. 25 (D.C.Cir.1983).

█ The Secretary's denial of the Ocean-going Group application also cannot stand. The decision denying that application applied unstated and vague criteria, and did not adequately support its conclusion that the service of Oceangoing merchant seamen did not constitute active military service. Without clarification of the criteria and further exposition of the reasons for denying that application, the Secretary's decision provides an insufficient basis for upholding that denial. However, it is not possible on the basis of the present record to determine whether denial of that application either in whole or in part would necessarily constitute an abuse of discretion.

In light of the foregoing conclusions, it is unnecessary to address plaintiffs' claims that bias in the decision-making process denied them due process. *See Ashwander v. TVA*, 297 U.S. 288, 341, 56 S.Ct. 466, 480, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

For the reasons stated above, it is this 15th day of July 1987, hereby

ORDERED: that plaintiffs' motion for summary judgment should be, and hereby is, GRANTED; and it is further

ORDERED: that defendant's motion for summary judgment should be, and hereby is, DENIED; and it is further

ORDERED: that the parties shall file supplemental memoranda on or before August 5, 1987, addressing more fully what remedy, if any, is appropriate in light of the conclusions stated above, and identifying the Court's authority to grant such relief.