Mandel FOGEL, Pro se, Plaintiff,

v.

DEPARTMENT OF DEFENSE, Sec'y
Air Force and Chairman of Civilian
Military Review Board, Defendants.

No. CV 01–3269 ADSMLO.

United States District Court,
E.D. New York.

Oct. 29, 2001.

Mandel Fogel, Ocean, NY, plaintiff pro se.

Alan Vinegrad, United States Attorney, Eastern District of New York, Long Island Federal Courthouse, Central Islip, NY by Susan L. Riley, Assistant United States Attorney, for defendants.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

This case marks another chapter in the recurring vestiges of World War II, an event recently referred to as "the defining event of the modern era" (David M. Kennedy, *It's Been Dark Before*, N.Y. Times, Oct. 28, 2001, at 14 (Week in Review)).

Mandel Fogel ("Fogel" or the "plaintiff"), a *pro se* plaintiff, commenced this action on May 22, 2001. In an order dated June 7, 2001, the Court *sua sponte* dismissed the complaint without prejudice, because it consisted of only two conclusory sentences that failed to provide the defendants with sufficient notice of the claims asserted against them. The Court granted Fogel leave to file an amended complaint, which he did on July 5, 2001.

The amended complaint seeks a declaratory judgment stating that Fogel is a veteran for the purpose receiving a military burial in a national cemetery and etching the image of the American flag on his gravestone. Fogel claims that he is entitled to this relief based on his service in the United States Merchant Marine ("Merchant Marine") and the United States Maritime Service ("Maritime Service") during World War II ("WWII"). In particular, Fogel argues that: (1) the defendants' denial of the request by the Military Service Training Organization for veteran status was arbitrary and capricious; (2) the District Court for the District of Columbia has found that the Secretary of the Air Force abused his discretion in denying veteran status to two groups of men within the Merchant Marine, *see Schumacher v. Aldridge*, 665 F.Supp. 41 (D.D.C.1987); and (3) the Selective Service System issued an opinion stating that service in the Merchant Marine or the Maritime Service is "tantamount to military service".

Aware that Fogel's application could be time sensitive, the Court held a conference on July 13, 2001 in regard to the issues presented by the amended complaint. During that conference, several questions arose that could not be answered by Fogel or the Government. Therefore, the Court directed the Government to submit a brief to assist the Court in answering the following questions: (1) what is the difference between the Merchant Marine and the Maritime Service; (2) of which entity was Fogel a member; (3) to whom does one apply for veteran status; (4) did Fogel apply for veteran status and, if so, to whom; and (5) what is the administrative history, if any, of this case. The Court also directed Fogel to submit opposition papers. The Court has received and reviewed briefs submitted by both parties. In addition, on October 19, 2001, the Court heard oral argument in regard to the issues raised in the briefs. This memorandum of decision and order addresses the issues presented by the parties in their papers and during oral argument.

## I. BACKGROUND

### A. The Maritime Service

The following facts are taken from the amended complaint, the Government's

brief, Fogel's opposition, and the administrative record supplied by the Government (numerical references preceded by "A.R." refer to pages of the administrative record). The term "Maritime Service" describes a uniformed paramilitary service, the primary task of which was to train United States Merchant Marine Personnel (A.R.13, 35, 130). The term "Merchant Marine" describes a broader group and "applies to the industry as a whole and covers the construction, planning, manning, and operations conducted in handling the water-borne commerce of the Nation" (A.R.130).

The Maritime Service was established by the Merchant Marine Act of 1936, 46 U.S.C § 1126, "as a voluntary organization for the training of citizens of the United States to serve as licensed and unlicensed personnel on American merchant vessels." 46 U.S.C. § 1126(a); see A.R. 35, 129–30. It was a "governmental agency composed of uniformed volunteers and created to bring the personnel of the Merchant Marine to a high point of professional efficiency" (A.R.35, 131).

To that end, the Maritime Service operated five types of training schools where personnel were trained in "every activity carried on aboard the merchant vessel" (A.R.35, 130):(1) Maritime Service Training Stations; (2) Maritime Service Officers' Schools; (3) Maritime Service Radio Training Stations; (4) Maritime Service Upgrade Schools; and (5) special training courses for ship's carpenters, assistant purser-hospital corpsmen, communications, and convoy procedures as well as barrage balloon schools, and turbo-electric schools. The Maritime Service Training Stations included three "shore training stations where new men [were] trained for positions as unlicensed seamen in the deck, engine, or stewards departments" (A.R. 133). It appears from the Administrative

Record that the Maritime Service Training Organization was the Maritime Service subgroup responsible for operating the various training schools. The plaintiff was a member of the Maritime Service Training Organization who was stationed at the United States Maritime Service Training Station, Sheepshead Bay, New York, from 1944 to 1945.

During the War, the Maritime Service Training Organization was placed under the jurisdiction of the War Shipping Administration ("WSA"). In turn, the WSA was a civilian federal agency that reported to the President and that was responsible for overseeing the merchant fleet and ensuring that military cargo, including military and civilian personnel and supplies, were safely transported to their war zone destinations overseas during World War II.

The courses offered by training stations, such as the one at Sheepshead Bay, were generally of a non-military character. The instructors taught traditional merchant marine skills such as general seamanship, lifeboat and life raft equipment, practical steering, practical boat training, practical steaming, masts and rigging, anchors and fittings, boiler fitting and cleaning, and the use of hand tools and electricity. However, a few courses, such as ones in radio procedures and barrage balloon operations were applicable to the military requirements of World War II.

Members of the Maritime Service, including the plaintiff, were sworn into the service under military oath, wore uniforms similar to those of the United States Coast Guard and the United States Navy, and had pay scales identical to those of the Coast Guard. Maritime Service personnel engaged in military drill formations and exercises. However, notwithstanding this military visage, members of the Maritime Service training organization, such as the

plaintiff, remained civilian volunteers who could resign upon their request. At oral argument on October 19, 2001, the plaintiff stated that anyone who resigned received a dishonorable discharge. However, this allegation is contradicted by the materials in the Administrative Record.

In his amended complaint, Fogel states that he enrolled in the Maritime Service in response to solicitations for such service from the United States military. He asserts that he served as a merchant seaman and achieved the rank of pharmacist's mate, second class. He explains that he wore a uniform similar to that worn by members of the Navy; was paid according to the Navy's pay scale; was required to conform to the disciplinary rules of the Navy; and worked under the supervision of Naval officers. Fogel also states that he fired Navy rifles; spent 36-hour periods of time awake and on-duty; and attended to the medical needs of Navy personnel. Fogel was awarded the World War II Victory Medal and was "honorably discharged" from the Merchant Marine.

### B. Veteran Status is Accorded to Certain Civilian Groups

The GI Improvement Act of 1977, Pub.L. No. 95–202, 91 Stat. 1433 (codified as amended in scattered sections of 38 U.S.C.), accorded veteran status to members of the Women's Air Forces Service Pilots ("WASPS"), which was a group of federal civilian employees attached to the United States Army Air Force during World War II. 38 U.S.C. § 106(a). The Act also provided the Secretary of Defense with the authority to grant veteran status to "any person in any other similarly situated group the members of which rendered service to the Armed Forces of the United States." 38 U.S.C. § 106, note (a)(1). To determine whether a group was similarly situated to the WASPs, and whether its members rendered service to the Armed Forces, the Secretary must

have reviewed the historical records and other evidence pertaining to the civilian group in question and determined "on the basis of judicial and other appropriate precedent, that the service of such group constituted active military service." *Id.* In making this determination, the Secretary may take into consideration the extent to which:

(A) such group received military training and acquired a military capability or the service performed by such group was critical to the success of a military mission,

(B) the members of such group were subject to military justice, discipline, and control,

(C) the members of such group were permitted to resign,

(D) the members of such group were susceptible to assignment for duty in a combat zone, and

(E) the members of such group had reasonable expectations that their service would be considered to be active military service.

*Id.* note (a)(2)(A)–(E).

The Secretary of the Department of Defense promulgated regulations implementing section 106 at 32 C.F.R. Part 47 (1980). The regulations delegated to the Secretary of the Air Force the "authority to determine if the service of a group constituted active military service." 32 C.F.R. § 47.4(a). The regulations also established the Department of Defense Civilian/Military Service Review Board (the "C/MSRB") and Advisory Panel. 32 C.F.R. §§ 47.4, 47.6. The C/MSRB's purpose was to review applications of civilian groups seeking veteran status and make written recommendations to the Secretary of the Air Force as to whether the civilian groups were similarly situated to the WASPs and thus, were entitled to active military service status. 32 C.F.R. §§ 47.5, 47.6, 47.7. The C/MSRB's review was limited to the

written submissions of the applicant on behalf of a group, a written report prepared by the appropriate member or members of the Advisory Panel, other relevant information, and the criteria established by law. 32 C.F.R. § 47.7(a). The regulations did not include an explanation or definition of the five criteria set forth in the statute. *See* 32 C.F.R. Part 47.

Upon completion of its review, the C/MSRB transmitted its recommendation to the Secretary of the Air Force. 32 C.F.R. § 47.7(b). Although the Secretary of the Air Force rendered the ultimate decision regarding whether the service of a civilian group be considered active military service in one of Armed Forces, "[t]he Board's recommendations and accompanying rationale have been adopted by the Secretary without fail." *Schumacher,* 665 F.Supp. at 44.

If a civilian group is found to have rendered service comparable to that of active military service, its members may submit an application for discharge to the appropriate military department. 32 C.F.R. § 47.7(d). Furthermore, group members become veterans "for purposes of all laws administered by the Veterans Administration," and are entitled to a military burial with an American flag draping the casket of the deceased. 38 U.S.C. § 106, note (a)(1); 38 U.S.C. § 2301. If the Secretary of the Air Force determines that the service of the civilian group is not "active military service" in the Armed Forces, the members of the group are not "discharged" from the Armed Forces and are not eligible for veterans' benefits or a military burial.

## C. The Application of the Maritime Service Training Organization and the Decision of the Civilian/Military Service Review Board

On October 30, 1980, the Maritime Service Training Organization (the "Training Organization") filed an application with the C/MSRB entitled, "Application for Group Determination that the United States Maritime Service Training Organization of WWII Was an Active Military Service." On January 5, 1982, the C/MSRB rejected the contentions of the Training Organization and recommended that its members be denied active military service status. In making this determination, the C/MSRB considered the application materials of the Training Organization as well as a report it had asked the United States Naval Historical Center to prepare.

The C/MSRB described the Training Organization as "a uniformed, para-military service comparable to the peacetime Coast Guard or the Public Health Service" (A.R.8). It noted that the organization's primary task was training merchant marine personnel, who generally served on board U.S. merchant ships after the completion of their training (A.R.8). The C/MSRB also found that although the Maritime Service was under the jurisdiction of the War Shipping Administration during World War II, it was reestablished within the Maritime Commission on January 1, 1947 (A.R.8).

According to the C/MSRB, the Training Organization had some of the attributes of a military organization, including a system or rates and ranks, uniforms, and the use of military drill formations (A.R.9). The C/MSRB distinguished the Maritime Service from the Coast Guard, noting that while the Coast Guard was transferred from civilian to military control during World War II, the Maritime Service was not so placed (A.R.9).

The C/MSRB stated that the instructors were required to have a knowledge of the skills traditionally used by members of the merchant marine, and the courses offered

were of a non-military character (A.R.9). The C/MSRB noted, however, that some of the training, such as barrage balloon operations, radio procedures, and emergency ship procedures had applicability to the military requirements of World War II (A.R.9). The C/MSRB concluded that "[b]ecause the group's primary mission was to offer instruction in traditional merchant marine skills, the Board finds that it did not acquire a military capability" (A.R.9).

The C/MSRB further concluded that although the Maritime Service "clearly contributed to the overall war effort by training merchant seamen," the service rendered was not critical to the success of a particular military mission (A.R.9). The C/MSRB noted that although some members of the Maritime Service may have entered into combat zones, the record presented no evidence that such duty was normal or expected (A.R.9). Rather, members of the Maritime Service were typically assigned to training stations based ashore in the continental United States (A.R.9).

The C/MSRB found that the record did not indicate that the members of the Maritime Service Training Organization were "subject to the justice, discipline, or control of the American military establishment," but that these matters were handled by the Commandant of the Maritime Service (A.R.9). Further, the regulations of the War Shipping Administration provided that the Commandant continue to oversee matters of discipline and order, despite the fact that the Maritime Service was under the jurisdiction of the War Shipping Administration (A.R.9).

Notably, the C/MSRB found that enrollment in the Maritime Service was voluntary, and members could be "disenrolled upon request" (A.R.9).

In regard to the expectations of enrollees, the C/MSRB noted that prior to July 1942, when the Maritime Service Training Organization was subordinated to the Coast Guard, it was possible that some members of the group viewed their service as active military service (A.R.10). However, the C/MSRB concluded that this view could not have lasted when the Coast Guard was shifted to the control of the Navy, and the Maritime Service Organization became a civilian component of the War Shipping Administration (A.R.10).

Thus, the C/MSRB found that the Maritime Service met none of the criteria suggested by 38 U.S.C. § 106, and recommended that the group's service not be considered equivalent to active military service (A.R.8).

On January 23, 1982, the Secretary of the Air Force adopted the recommendation of the C/MSRB.

## D. The Plaintiff's Requests For Review

More than 16 years later, on June 17, 1998, the plaintiff appealed from the Secretary's decision to the Chief Marine Personnel Branch of the U.S. Coast Guard. The plaintiff argued that the Secretary's decision depriving members of the Maritime Service of veteran status "is a form of discrimination against a group of war time volunteers while favoring others" (A.R.5). In support of this claim, Fogel argued that (1) the Maritime Service was quasi-military; (2) when enrolled in the Maritime Service, one's civilian rights were suspended; (3) Maritime Service personnel wore uniforms similar to those worn by members of the Coast Guard and the Navy; (4) members of the Maritime Service were paid according to the pay scales established by the Coast Guard and the Navy; (5) Maritime Service personnel were disciplined; (6) the Maritime Service was su-

pervised by Naval officers; (7) as a pharmacist mate, the plaintiff served under the control of the United States Public Health Service, which he alleged was part of the armed forces; and (8) the service provided by the members of the Maritime Service was similar to the service provided by the U.S. Public Health Service, the Coast Guard, and the Women's Air Force. Apparently, Fogel did not receive a response to his letter.

Eight months later, on February 1, 1999, Fogel sent a letter to the Secretary of Defense reiterating his claim that service in the Maritime Service should be recognized as active military service (A.R.3–4). In a letter dated February 17, 1999, the C/MSRB responded to the plaintiff's inquiry (A.R.1–2). The C/MSRB informed the plaintiff that on January 28, 1982, the Secretary of the Air Force determined that the service of the Training Organization was not considered active military service in the Armed Forces of the United States for Veterans Administration Benefits. The C/MSRB pointed out to the plaintiff that it had determined that the Maritime Service training organization "met almost none of the criteria suggested by Public Law 95–202" (A.R.1).

The C/MSRB further informed Fogel that since the January 28, 1982 decision, the C/MSRB had received two applications for reconsideration of that decision and had concluded that neither application presented "new, relevant, and substantive" evidence relating to the recognition criteria. The C/MSRB told Fogel that his "present correspondence also does not provide new evidence" (A.R.2). The C/MSRB indicated that it would reconsider its prior recommendation to the Secretary if Fogel submitted "new, relevant, and substantive" evidence concerning the criteria, especially in regard to "incidents of service" (A.R.2). Instead of submitting further evidence to

the C/MSRB, the plaintiff filed the present lawsuit, which seeks review of the January 23, 1982 determination of the Secretary of the Air Force on the ground that the decision was arbitrary and capricious.

## II. *DISCUSSION*

### A. Jurisdiction

 The first task facing the Court is to determine whether and how it has jurisdiction over this case. Fogel claims that jurisdiction is provided by the declaratory judgment statute, 28 U.S.C. § 2201. However, the declaratory judgment statute is not an independent basis for subject matter jurisdiction in the district courts. *See Skelly Oil Co. v. Phillips Petroleum Co.,* 339 U.S. 667, 671–72, 70 S.Ct. 876, 94 L.Ed. 1194 (1950); *Fleet Bank, N.A. v. Burke,* 160 F.3d 883, 886 (2d Cir.1998).

 Nevertheless, a district court may have subject matter jurisdiction under 28 U.S.C. § 1331 over a claim that an agency has violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et. seq. Califano v. Sanders,* 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977); *Clark v. Commodity Futures Trading Comm'n,* 170 F.3d 110, 112 n. 1 (2d Cir.1999). Fogel claims that the January 23, 1982 decision of the Secretary of the Air Force, which concluded that the service of the Maritime Service Training Organization does not constitute service in the Armed Forces of the United States for the purpose of receiving the benefits of the laws administered by the Veterans' Administration, was arbitrary and capricious and should be declared "null and void." Thus, it appears that the Court has jurisdiction over Fogel's complaint pursuant to the APA.

Subject matter jurisdiction pursuant to the APA is further supported by the fact that where a statute authorizing agency action fails to address the availability of

judicial review, the courts generally assume that Congress intended to permit judicial review. *See* 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."); *Block v. Community Nutrition Institute*, 467 U.S. 340, 349, 104 S.Ct. 2450, 2455, 81 L.Ed.2d 270 (1984); *see also Abbott Laboratories v. Gardner*, 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967). Here, the Secretary's decision was made pursuant to Title IV, section 401 of the GI Improvement Act of 1977, Pub.L.No. 95–102, 91 Stat. 1433 (codified as amended in scattered sections of 38 U.S.C.). This Court has been unable to find the part of that statute that addresses the availability of judicial review of the Secretary's decisions and, thus, presumes that such review is available.

■ The only exception to this general rule is the APA provision precluding review "where a decision is committed to agency discretion." 5 U.S.C. § 701(a)(2). Although this provision seems to preclude review of any discretionary decision made by an agency, the exception is actually much more "narrow," *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), and applies only when "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion," *Heckler v. Chaney*, 470 U.S. 821, 830, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985); *see Natural Resources Defense Council, Inc. v. Fox*, 30 F.Supp.2d 369, 378 (S.D.N.Y. 1998).

■ The Court finds that while the GI Improvement Act of 1977 gave the Department of Defense—which delegated its authority to the Secretary of the Air Force— broad discretion to determine what service constitutes active military service, that discretion is not unfettered. The Act provides five criteria for determining whether certain service can be considered active military service. *See* 38 U.S.C. § 106 note (a)(2)(A)–(E). These criteria themselves provide a framework for determining whether the Department of Defense has abused its discretion or acted in an arbitrary and capricious manner in denying active military service status to a particular civilian group.

Based on the foregoing, the Court finds that the APA, which provides for judicial review of a "final agency action for which there is no other adequate remedy in a court," 5 U.S.C. § 704, is applicable to the facts of this case. *See generally Schumacher v. Aldridge*, 665 F.Supp. 41, 51 (D.D.C.1987) (reviewing Secretary's decision pursuant to standards and procedures of the APA). Thus, whether the Court has jurisdiction over Fogel's complaint hinges upon whether the decision that Fogel is challenging is "final" so that this Court may exercise its power of review under the APA.

■ To determine when an agency action is final, the Supreme Court has looked at whether its impact "is sufficiently direct and immediate" and has a "direct effect on ... day-to-day business." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 152, 87 S.Ct. 1507, 1517, 18 L.Ed.2d 681 (1967). An agency action is not final if it is only "the ruling of a subordinate official," or "tentative." *Id.* at 151, 87 S.Ct. at 1517. "The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Franklin v. Massachusetts*, 505 U.S. 788, 796 112 S.Ct. 2767, 2773, 120 L.Ed.2d 636 (1992). The Second Circuit has described a "final agency decision" as one that "mark[s] the consummation of the agency's

decisionmaking process" and determines the rights and obligations of the parties. *See Top Choice Distributors v. United States Postal Service*, 138 F.3d 463, 466 (2d Cir.1998) (quoting *Bennett v. Spear*, 520 U.S. 154, 117 S.Ct. 1154, 1168, 137 L.Ed.2d 281 (1997)).

■ Here, the January 23, 1982 determination of the Secretary constitutes is the final agency action in regard to the Maritime Service Training Organization's application for their service to be recognized as active military service. The Secretary's determination was neither tentative nor interlocutory, *see Top Choice*, 138 F.3d at 466 (distinguishing tentative or interlocutory determinations from final ones), but instead marked the end of the agency's decisionmaking process in regard to the application. Furthermore, the denial of veterans' benefits was the legal consequence that flowed from the decision. Accordingly, the Secretary's January 23, 1982 determination was a final agency action under the APA, *see id.* and this Court has jurisdiction over Fogel's claim challenging it. *See* 5 U.S.C. § 704.

### B. Statute of Limitations

Several Circuit Courts have held definitively that "[i]t ... appears beyond question that the six-year statute of limitations of § 2401(a) applies to actions brought pursuant to the APA." *Sierra Club v. Slater*, 120 F.3d 623, 631 (6th Cir.1997); *see United States v. Minor*, 228 F.3d 352, 359 n. 6 (4th Cir.2000); *Dunn–McCampbell Royalty Interest, Inc. v. National Park Serv.*, 112 F.3d 1283, 1286 (5th Cir.1997); *Pennsylvania Dep't of Public Welfare v. United States Dep't of Health & Human Services*, 101 F.3d 939, 944–45 (3d Cir. 1996) ("The applicable statute of limitations for civil actions against the United States under the ... APA is six years."); 

*James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1093–94 (D.C.Cir.1996).

■ Although the Second Circuit has not made such a clear finding, in an action brought pursuant to the APA challenging the forfeiture procedures of the Drug Enforcement Agency ("DEA"), the Court held that the statute of limitations to be applied is the one supplied by 28 U.S.C. § 2401(a). *See Polanco v. United States*, 158 F.3d 647, 652–53 (2d Cir.1998). Section 2401(a) provides that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." The Court finds that the six-year statute of limitations set forth in section 2401(a) applies to this case, because as in *Polanco*, the case is brought pursuant to the APA against the United States. *See Polanco*, 158 F.3d at 652–53; *see also Minor*, 228 F.3d at 359 n. 6; *Sierra Club*, 120 F.3d at 631; *Royalty Interest*, 112 F.3d at 1286; *Pennsylvania Dep't of Public Welfare*, 101 F.3d at 944–45; *James Madison Ltd.*, 82 F.3d at 1093–94.

As noted, the final agency action in this case occurred on January 23, 1982, the date the Secretary of the Air Force determined that the service of the Maritime Service Training Organization was not active military service. *See Blassingame v. Secretary of the Navy*, 811 F.2d 65, 71 (2d Cir.1987) (holding that the right to judicial review of a decision of a military board accrues at the time of the decision to discharge). Accordingly, for Fogel's lawsuit to be considered timely, he would had to have filed it within the next six years and at the latest, on or about January 23, 1988. However, Fogel did not even seek an administrative appeal of the Secretary's decision until June 1998, approximately ten and one-half years after the expiration of the statute of limitations. Moreover, the

plaintiff did not file his lawsuit seeking judicial review of the Secretary's decision until May 2001, thirteen and one-half years after the expiration of the statute of limitations and nineteen years after the Secretary's adverse decision. Accordingly, the plaintiff's complaint is time-barred.

The Court raised this issue at the October 19, 2001 oral argument and afforded Fogel an opportunity to present authority showing that his case can overcome the obstacle presented by the statute of limitations. The plaintiff has submitted a memorandum of law in which he makes two arguments in support of his position in this regard. First, Fogel argues that the agency decision was not final until February 17, 1999, when the Office of the Secretary of the Air Force responded to his request regarding veteran status for members of the Maritime Service Training Organization. The Court is not persuaded by this argument, because Fogel's letter to the Secretary of the Air Force is, in essence, a request for the Secretary to reconsider his earlier determination. Moreover, the response Fogel received clearly informs him that like the other two applications for reconsideration of the Secretary's decision, Fogel's application fails to set forth "new, relevant, and substantive" evidence that the Maritime Service Training Organization meets the statutory criteria. Thus, based on the nature of Fogel's letter and the response he received, the Court finds that the February 17, 1999 letter from the Secretary's Office was the denial of Fogel's application for reconsideration, not the agency's final action.

In his supplemental memorandum regarding the statute of limitations, Fogel also refers to a number of cases in which district courts have reviewed military agency decisions. However, in none of these cases did a court find that it had jurisdiction to hear the case when the statute of limitations expired thirteen years earlier. *See Nieszner v. Mark,* 684 F.2d 562 (8th Cir.1982); *NeSmith v. Fulton,* 615 F.2d 196 (5th Cir.1980); *Nicholson v. Brown,* 599 F.2d 639 (5th Cir.1979); *VanderMolen v. Stetson,* 571 F.2d 617 (D.C.Cir.1977); *Baker v. Schlesinger,* 523 F.2d 1031 (6th Cir.1975); *Moreno v. Commander, McChord Air Force Base,* 567 F.Supp. 1437 (D.Ariz.1983); *Kalista v. Sec'y of Navy,* 560 F.Supp. 608 (D.Colo. 1983); *Tufts v. Bishop,* 551 F.Supp. 1048 (D.Kan.1982); *Jamison v. Stetson,* 471 F.Supp. 48 (N.D.N.Y.1978).

Thus, Fogel's supplemental arguments have not persuaded the Court that the statute of limitations has been tolled, or that his case is exempt from its application. Accordingly, his complaint must be dismissed as time barred. Nevertheless, to complete the record, the Court will address Fogel's complaint on the merits.

## C. The Standard of Review

The Court finds that the agency determination at issue consists of the agency's interpretation of its own regulations, which instruct the C/MSRB to review the written application, report from the Advisory Panel, other relevant information, the criteria established by law, *see* 32 C.F.R. §§ 47.5, 47.6, 47.7, and the agency's interpretation of the statute, *see* 38 U.S.C. § 106, which provides five criteria which the Secretary of the Department of Defense should consider when determining whether the service of a civilian group constitutes active military service. *See* 38 U.S.C. § 106, note (a)(2)(A)–(E).

Under the APA, the Court must set aside agency action, findings, or conclusions it finds to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency decision may be deemed arbitrary, capricious or an abuse

of discretion "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view of the product of agency experience." *Motor Vehicle Mfrs. Assoc. of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *Henley v. Food and Drug Admin.,* 77 F.3d 616, 620 (2d Cir.1996); *State of New York v. Evans,* 162 F.Supp.2d 161, 166 (E.D.N.Y.2001). "Although the scope of judicial review under this standard is narrow and deferential, a reviewing court must be certain that an agency has considered all the important aspects of the issue and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Henley,* 77 F.3d at 620 (citations and internal quotations omitted); *United States v. Schmitt,* 999 F.Supp. 317, 367 (E.D.N.Y.1998) ("As long as the agency has considered all important aspects of the issue and stated a rational explanation for its choice, it will be sustained."). However, a "reviewing court cannot substitute its judgment for that of the agency." *Henley,* 77 F.3d at 620 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)).

### D. The Analysis

 The Court finds that the C/MSRB evaluated the service of the Maritime Service Training Organization in light of all the criteria set forth by Congress in the GI Improvement Act of 1977. *See* 38 U.S.C. § 106 note (a)(2)(A)–(E). The C/MSRB specifically found that the Training Organization did not acquire a military capability. *See* 38 U.S.C. § 106 note (a)(2)(A) (the extent to which the civilian group received military training and acquired military capability). In support of this conclusion, the C/MSRB determined that the courses offered by the Training Organization were generally of a non-military character, and the skills required of instructors were those of the merchant marine, not the military. The C/MSRB further found that the primary mission of the Training Organization was to train merchant marine personnel, who after the completion of their training, served aboard merchant ships, not in the armed forces.

In concluding that the Training Organization did not acquire military capability, the C/MSRB did not overlook the fact that the Training Organization had some of the attributes of a military organization, including a system of rates and ranks, uniforms and used military drill formations. The C/MSRB also considered the fact that some of the courses provided by the Training Organization were applicable to the military requirements of World War II. However, neither the military attributes of the Training Organization, nor the courses it offered in radio procedures, barrage balloon operations, and emergency ship procedures altered the C/MSRB's view that the Training Organization did not acquire military capability.

The C/MSRB also considered the second component of 38 U.S.C. § 106 note (a)(2)(A) (the extent to which the service of the civilian group was critical to the success of a military mission), and concluded that although the service of the Training Organization "clearly contributed to the overall war effort" (A.R.9), the service was not "critical to the success of a particular military mission," 38 U.S.C. § 106 note (a)(2)(A). In particular, the C/MSRB explained that the members of the Training Organization were assigned to training sta-

tions based ashore in the continental United States.

Thus, the C/MSRB's decision clearly and fully considered all of the aspects of the first criteria listed by Congress, namely, that the Training Organization did not receive military training; it did not acquire a military capability; and its service was not critical to the success of a military mission. Furthermore and importantly, the C/MSRB weighed evidence that did not support its conclusion and found that such evidence did not alter its finding that the service provided by the Training Organization did not meet the requirements of 38 U.S.C. § 106 note (a)(2)(A).

The C/MSRB also analyzed the second factor listed in the statute and determined that the Training Organization were not subject to military justice, discipline, and control. *See* 38 U.S.C. § 106 note (a)(2)(B) (the extent to which the members of the civilian group were subject to military justice, discipline, and control). On the other hand, the evidence presented to the C/MSRB demonstrated that the Commandant of the Maritime Service oversaw matters of discipline and order. Accordingly, the C/MSRB found that the application of the Training Organization did not fulfill the second criteria, *see* 28 U.S.C. § 106 note (a)(2)(B).

The C/MSRB found that, unlike members of the armed forces, members of the Maritime Service Training Organization were permitted to disenroll upon request, which was determinative of the third factor set forth by Congress. *See* 38 U.S.C. note (a)(2)(C) (whether members of the civilian group were permitted to resign).

In regard to the fourth criteria, the C/MSRB concluded that members of the Military Service Training Organization were stationed ashore in the United States and, thus, were not susceptible to assignment for duty in a combat zone. *See* 38 U.S.C. § 106 note (a)(2)(D) (the extent to which the members of the civilian group were susceptible to assignment for duty in a combat zone). Moreover, the personnel who trained at the stations operated by persons such as the plaintiff generally did not become members of the armed forces. Rather, they served aboard U.S. merchant ships. The C/MSRB noted that some members may have entered combat zones while they were onboard training ships, but there was no evidence that duty in such zones was normal or expected. Accordingly, the C/MSRB found that the Training Organization's application did not meet the fourth criteria in the statute. *See* 38 U.S.C. § 106 note (a)(2)(D).

Lastly, the C/MSRB found that the members of the Training Organization did not maintain reasonable expectations that their service would be considered by others as active military service. *See* 38 U.S.C. § 106 note (a)(2)(E) (the extent to which members of the civilian group had reasonable expectations that their service would be considered active military service). The C/MSRB stated that some members may have believed that their service would be considered active military service because from 1938 to 1942 the Maritime Service was subordinated to the Coast Guard. However, the C/MSRB states that this belief is not reasonable in light of the following facts: the Coast Guard was militarized while the Maritime Service was not; from 1942 through the end of the War, the Maritime Service remained a civilian organization that reported directly to the President; members of the Maritime Service used civilian medical facilities, as opposed to those operated by the military; members of the Maritime Service were not subject to military justice and had the right to resign. In light of these facts, the C/MSRB found that any expectation by a member of the Training

Organization that their service would be considered active military service was not a reasonable expectation. *See* 38 U.S.C. § 106 note (a)(2)(E).

Clearly, the C/MSRB's decision, later adopted by the Secretary, considered all of the criteria supplied by Congress and evaluated evidence that strengthened its conclusion as well as evidence that weakened it. *See Henley,* 77 F.3d at 620 (reviewing court must examine whether the agency has considered all the important aspects of the problem). Further, the C/MSRB's decision explains why the Training Organization's application failed to meet each of the criteria supplied by the statute by referring to information supplied by the administrative record. *See Henley,* 77 F.3d at 620 (reviewing court must determine that the agency has made a rational connection between the facts found and the choice made); *Schmitt,* 999 F.Supp. at 367 (agency's decision will be sustained provided that it has considered all important aspects of the issue and stated a rational explanation for its choice).

Moreover, there is no indication in the decision or the record that the C/MSRB relied on factors that Congress did not intend for it to consider. *See Motor Vehicle Mfrs. Assoc.,* 463 U.S. at 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (agency action is arbitrary and capricious if, among other things, it relies upon evidence Congress did not intend for it to consider). The Court also has reviewed the administrative record provided by the Government, and finds that the evidence it provides does not support a conclusion different than that of the Secretary. *See Motor Vehicle Mfrs. Assoc.,* 463 U.S. at 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (agency decision is arbitrary and capricious if, among other things, the explanation for it runs counter to the evidence before the agency). Therefore, applying the standard set forth in *Motor Vehicle Mfrs. Assoc.,* 463 U.S. at 43, 103 S.Ct. 2856, 77 L.Ed.2d 443, and *Henley,* 77 F.3d at 620, to the C/MSRB's decision in this case, the Court finds that the agency action was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. *See* 5 U.S.C. § 706(2)(A).

**E. *Schumacher v. Aldridge,* 665 F.Supp. 41 (D.D.C.1987)**

The decision of the District Court for the District of Columbia in *Schumacher v. Aldridge,* 665 F.Supp. 41 (D.D.C.1987), does not alter this conclusion. In that case, three people who served as merchant seamen during World War II sought judicial review of a decision by the Secretary of the Air Force to deny active military service status to (1) American merchant seamen who rendered service to the Armed Forces while in oceangoing service from December 7, 1941 to December 31, 1946 (the "Oceangoing Group") and (2) American merchant seamen who participated in World War II military invasions (the "Invasion Group"). *See Schumacher,* 665 F.Supp. at 42. There, as here, the plaintiffs claimed that the denials were arbitrary and capricious, an abuse of discretion, and contrary to law. *Id.*

In a thorough and well-crafted decision, the Court explained the statutory and regulatory framework for recognizing the active military service of certain civilian groups and discussed the attributes of three groups whose service had been recognized by the Secretary as involved in active military service. *See id.* at 42–45 (WASPs, Signal Female Telephone Operators Unit, and World War I Quartermaster Corps Female Clerical Employees Serving With the American Expeditionary Forces). The Court also reviewed the history of the Merchant Marine during World War II,

focusing specifically on the experience of merchant seamen. *See id.* at 45–49.

In particular, the Court noted that: Congress authorized merchant ships to be armed, because they were sailing on missions connected with the defense of the United States, *id.* at 46; merchant seamen received training in "gunnery, handling barrage balloons, wartime communications, gas warfare, swimming through burning oil, and enemy ship spotting at night," *id.* at 46; the peacetime requirements for specificity in shipping articles changed to "preserve wartime secrecy," *id.;* the WSA assumed control of the functions, duties and powers of the Maritime Commission in regard to the operation and requisition of vessels, *id.;* the President instructed the Administrator of the War Shipping Administration to collaborate with the military, *id.;* merchant ships transported military and civilian personnel to war zones, *id.* at 46–47; the military controlled the duration, route, and destination of merchant voyages, *id.* at 47; a seaman who attempted to resign during a voyage faced a military court martial, *id.;* the government made great efforts to attract men to serve in the Merchant Marine, *id.;* in a letter to local draft boards, the Director of the Selective Service System wrote that service in the Merchant Marine "may properly be considered as tantamount to military service," *id.* (emphasis omitted); the President "declared that for purposes of military decorations, the officers and crew members of the Merchant Marine would be regarded 'as members of the armed forces,'" *id.* at 48; a total of 5662 merchant seamen lost their lives or were declared missing in action during World War II, and an additional 609 merchant seamen became prisoners of war, *id.*

The District Court also reviewed the applications of the Oceangoing Group and the Invasion Group. *See id.* at 49–51. In particular, the Court noted that the Oceangoing Group consisted of seven subgroups who: (1) served on Navy gun crews; (2) served on ships that engaged the enemy ...; (3) were physically wounded (some disabled) as a result of enemy action; (4) became prisoners of war; (5) lost their ships because of enemy action but survived ...; (6) experienced battle reaction or convoy fatigue which resulted in their temporary assignment to convalescent centers operated under WSA; or (7) served in combat or war zones under constant threat of annihilation by enemy air or submarine attack. *Id.* at 49. The Court described the Invasion Group as consisting of "all American merchant seamen who participated in a military invasion during World War II, including the invasions of Normandy, Sicily and the Philippines." *Id.* at 50.

The Court found that the Secretary erred in denying the applications of both groups. *See id.* at 56 (finding that the Secretary "erred" in denying the application of the Invasion Group, and that "the Secretary's denial of the Oceangoing Group application also cannot stand"). At the outset, the Court found that the criteria set forth in the statute are vague, and "Congress might reasonably have hoped" that the regulations promulgated by the Secretary "would elaborate and better define the considerations relevant to a determination of 'active military service.'" *Id.* at 53. However, the Secretary failed to articulate "specific, meaningful criteria to guide decisions under [the statute] ... [but instead] adopted Congress' criteria, without change or supplementation." *Id.* Therefore, concluded the Court, important statutory terms, such as "military training," "reasonable expectation," and "active military service," were never defined in a manner that was useful to potential applicant groups. *Id.*

The Court also determined that the Secretary reached his decisions by applying criteria which had not been published in the statute or in the implementing regulations. The Secretary stated that the civilian groups who had been recognized as providing active military service had the following common characteristics, which the Invasion and Oceangoing Groups failed to demonstrate: (1) the group's service was well-integrated into the military structure, such that its members lived and worked under the same conditions as the military; (2) "extensive, if not pervasive, military control was exercised over the members of the group"; (3) the group was a "wartime organization, formed for or because of a wartime need"; (4) the members of the group were prevented by law from being in the military; and (5) the members had expectations of military service, not simply military benefits. *See id.* at 51–52. The Court held that by deciding the applications of the Invasion Group and the Oceangoing Group on the basis of these unpublished criteria, the Secretary denied the members of those groups "a fair opportunity to present their case." *Id.* at 53.

The Court also held that the Secretary failed to apply the vague criteria in a consistent fashion. The Court pointed out that many of the Secretary's decisions do not even refer to the statutory criteria. Furthermore, those decisions that refer to the criteria, do not apply them in a "workmanlike manner." *Id.* at 54–55. The Secretary denied the plaintiffs' applications because a seaman could decline to volunteer for another voyage; the military training of merchant seamen was limited and defensive in nature; and the ship's master was responsible for most of the discipline. *See id.* at 55. However, the record showed that members of successful applicant groups could resign; the record was silent as to the military training of

dieticians, telephone operators, and other successful applicants; and more than 100 merchant seamen were court-martialed, but no WASP ever was. *See id.* at 55.

Despite the fact that the Secretary applied vague or unpublished criteria in an inconsistent fashion, the Court held that, "[n]evertheless, the record indicates that [the Invasion Group] . . . satisfied the relevant, published criteria to an equal or greater extent than some successful groups." *Id.* at 55. Therefore, concluded the Court, the Secretary erred in denying that group's application. *Id.* at 56. The Court also found that the Secretary's denial of the Oceangoing Group application could not stand, because he applied unstated and vague criteria and failed to support his conclusion. *Id.*

This Court agrees with the statement in *Schumacher* that the Secretary "fail[ed] to articulate clear and intelligible criteria for the administration of section 401." *Id.* at 52. However, unlike *Schumacher*, the record in this case indicates that the Maritime Service Training Organization did not satisfy any of the five published criteria. As discussed above, the C/MSRB's decision specifically refers to each of the criteria and explains how the application failed to fulfill it.

Another notable difference between *Schumacher* and the present case is the fact that the plaintiffs in *Schumacher* filed a timely lawsuit. The Secretary denied the application of the Oceangoing Group on January 13, 1982, and the application of the Invasion Group at an unspecified date after May 15, 1983. *See Schumacher,* 665 F.Supp. at 42. The plaintiffs representing each group filed their lawsuit in July 23, 1986, which was within six years of both denials. As explained above, Fogel's lawsuit was filed thirteen years after the six-year statute of limitations expired.

This case is also distinguished from *Schumacher* by the fact that in Schumacher, the plaintiffs annexed to the complaint the fourteen decisions in which the Secretary recommended approving a civilian group for active military service status. *See id.* at 44, n. 2. The Court in *Schumacher* focused on the differences between those fourteen favorable decisions and the unfavorable decisions the plaintiffs were requesting that it review, and specifically found that the Secretary failed to apply the statutory criteria in a "workmanlike manner." The record in this case does not contain favorable decisions of the C/MSRB to which the Court can compare the present unfavorable decision. During both of his court appearances, Fogel strenuously argued that the service of the Training Organization satisfied the criteria to a greater extent than the WASPs, the telephone operators, and the dieticians. However, he did not supply the Court with the C/MSRB's decisions in those cases, which may or may not have substantiated his position. Without the opportunity to review materials that might support the plaintiff's position, the Court is unable to conclude that the application of the Training Organization satisfied the statutory criteria to an equal or greater extent than some of the successful groups. Similarly, the Court cannot conclude, as did the Court in *Schumacher*, that the C/MSRB failed to apply the criteria in an evenhanded manner.

Based on the present record, this Court can conclude that there are vast differences between the Invasion and Oceangoing Groups and the Training Organization. The Invasion and Oceangoing Groups consisted of merchant seamen, while the Training Organization consisted of personnel who trained merchant seamen. Among other things, members of the Invasion and Oceangoing Groups served on ships that engaged the enemy, were physically wounded or disabled as a result of enemy action, became prisoners of war, served in combat or war zones, or participated in the invasions of Normandy, Sicily, and the Philippines. Members of the Training Organization, on the other hand, trained personnel "who, upon graduation or completion of training courses [were] employed on privately owned ships of American steamship lines" (A.R.35). Although men like the plaintiff may have trained men who later became members of the Invasion and Oceangoing Groups, the differences in their wartime experience are clear and definitive. Thus, for this reason as well, the Court finds that the decision in *Schumacher* does not control the outcome of this case.

The Court finds that the Secretary's decision adopting the C/MSRB's recommendation to deny active military service status to the members of the Training Organization was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Notwithstanding this decision, the Court wishes to state emphatically, and for the record, that the plaintiff and his fellow members of the Training Organization made an extraordinary contribution to the War effort. Fogel and his colleagues may not have been oceangoing merchant seamen, but their dedicated service, and the outstanding training they provided to members of the merchant marine enabled those men to assist the United States in "carry[ing] the war to the enemy and fight[ing] on his territory and not on our own" (A.R.2).

There is no doubt that the exceptional efforts and personal sacrifice of the men of the Maritime Service Training Organization greatly facilitated this country's ultimate success in World War II. Although, regrettably, all of these individuals cannot be recognized as veterans, our fellow

Americans appreciate that their efforts helped preserve the freedoms we enjoy today. However, a "reviewing court cannot substitute its judgment for that of the agency." *Henley*, 77 F.3d at 620 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)).

### F. Alternative Form of Relief

On January 11, 1988, the C/MSRB recommended granting active military service status to all oceangoing merchant mariners who served aboard United States merchant vessels between December 7, 1941 and August 15, 1945. The Secretary of the Air Force adopted this recommendation on January 19, 1988. On November 10, 1998, Congress passed the Veterans Programs Enhancement Act of 1998, P.L. 105–368, 1998 H.R. 4110 (1998) (codified as amended in scattered sections of the United States Code), which among other things extended veterans' burial and cemetery benefits to oceangoing merchant mariners who served aboard United States merchant vessels between August 16, 1945 and December 31, 1946. *See* 46 U.S.C. § 11202. To be eligible, the applicant must be a member of the merchant marine who served as the crewmember of a vessel that was operated by the WSA or the Office of Defense Transportation; operated in "waters other than inland waters, the Great Lakes, and other lakes, bays, and harbors of the United States;" operated under contract to the Government of the United States; and served the Armed Forces. *See* 46 U.S.C. § 11202(1).

Although Congress has expanded the number of people who are eligible for veterans burial and cemetery benefits, members of the Training Organization are still not eligible. However, on May 30, 1988, six months after the Secretary recognized the service of oceangoing merchant mari-

ners as "active military service," Congress passed the Merchant Marine Decorations and Medals Act, Pub.L. No. 10–324, 102 Stat. 576 (codified as amended at 46 U.S.C.App.2001, *et. seq.*). This statute affords the Secretary of Transportation with the authority to "issue at no cost a flag of the United States and a grave marker to the family or personal representative of a deceased individual, who served in the United States merchant marine in support of the Armed Forces of the United States or its allies in periods of war or national emergency." 46 U.S.C.App.2005. Fogel may be able to obtain some of the relief he seeks in this Court by submitting an application to the Secretary of Transportation under the provision of this statute.

In addition, it appears that since the *Schumacher* decision, the regulations implementing the GI Improvement Act of 1977 have been significantly altered. *See* 32 C.F.R. § 47.4. In particular, the regulations articulate in a detailed fashion the criteria considered by the C/MSRB when evaluating an application for active military service status. Importantly, the regulations now contain a subsection explaining that a group may apply for reconsideration if it presents "new, relevant, and substantive evidence." 32 C.F.R. § 47.4. Thus, it appears that Fogel and his colleagues may submit an application for reconsideration based on the new criteria contained in the regulations.

### III. *CONCLUSION*

Having reviewed the parties' submissions and having given them an opportunity for oral argument, it is hereby

**ORDERED,** that the plaintiff's complaint is dismissed as time-barred; and it is further

**ORDERED,** that even if the complaint had been timely, the decision of the Secretary of the Air Force, dated January 23,

1982, which denied active military service status to the Maritime Service Training Organization would be affirmed on the ground that the decision is not arbitrary, capricious, an abuse of discretion or otherwise contrary to law; and it is further

**ORDERED,** that the Clerk of the Court is directed to close this case.

**SO ORDERED.**